**FILED**
**Aug 28, 2025**
**07:00 AM(CT)**
**TENNESSEE**
**WORKERS' COMPENSATION**
**APPEALS BOARD**



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
## WORKERS' COMPENSATION APPEALS BOARD

| | |
|---|---|
| David Rainey | ) Docket No. 2024-10-3184 |
| | ) |
| v. | ) State File No. 19611-2023 |
| | ) |
| U.S. Xpress, Inc., et al. | ) |
| | ) |
| | ) |
| Appeal from the Court of Workers' | ) Heard August 1, 2025, |
| Compensation Claims | ) in Nashville, TN |
| Thomas L. Wyatt, Judge | ) |

---

### Reversed and Remanded

---

In this interlocutory appeal, the employer challenges the trial court's award of medical and temporary disability benefits. The employee, a commercial truck driver, claimed that the cab of his truck shook violently over a ninety-minute period as he attempted to park at a truck stop, causing an injury to his cervical spine. The employer initially accepted the claim as compensable based on the authorized physician's opinion and provided medical and temporary disability benefits. The employer then retained an orthopedist to perform a medical records review, and that physician concluded the employee had reached maximum medical improvement with respect to his alleged work-related accident. Consequently, the employer ceased paying temporary disability benefits. The employer also reviewed data from the truck's vehicle monitoring systems, and, because those reports did not reflect the alleged event as described by the employee, it denied any further benefits. The treating physician eventually recommended cervical spine surgery and opined the need for surgery was caused primarily by the alleged work accident, but the employer had, by that point, denied the claim. The employer then asked the orthopedist it previously retained for the medical records review to perform a medical examination of the employee, and he opined that even if the incident occurred as described by the employee, it was less than fifty percent the cause of the need for the recommended surgery. After an expedited hearing, the trial court found the employee was likely to prevail at trial in showing that his cervical spine condition arose primarily out of the event he had described. It also determined the authorized treating physician offered the most probable explanation of the primary cause of the need for surgery, and it awarded additional medical and temporary disability benefits. The employer has appealed. Upon careful consideration of the record and the arguments of counsel, we reverse the trial court's order and remand the case.

Judge Meredith B. Weaver delivered the opinion of the Appeals Board in which Presiding Judge Timothy W. Conner and Judge Pele I. Godkin joined.

C. Scott Johnson, Chattanooga, Tennessee, for the employer-appellant, U.S. Xpress, Inc.

Ashley B. McGee, Hendersonville, Tennessee, for the employee-appellee, David Rainey

**Factual and Procedural Background**

David Rainey ("Employee") was hired by U.S. Xpress, Inc. ("Employer"), as a truck driver in February 2023. On March 9, 2023, following his scheduled delivery, Employee stopped at a Love's truck stop in Dickson, Tennessee for the night. The following day, he made his next delivery to another Tennessee location and then called Employer to report an injury he said had occurred the evening before while parking his truck. According to an internal injury report, Employee stated that "while backing the truck/trailer unit into [the] parking spot for the night he observed the warning lamp [il]luminate 'Clutch Overheat.' While attempting to back the unit the truck started bucking back and forth when suddenly he began to feel his back hurting. [Employee] complains of extreme pain to the lower back and has requested to seek treatment." Following receipt of this report, Employer authorized emergency medical care, and Employee proceeded to Williamson Medical Center at 5:01 pm on March 11, 2023, where he reported "driving on some steep hills and inclines recently and . . . when he was backing up his big rig [a] couple of nights ago the cab of the truck began shaking violently." Employee complained of neck/back pain, and a CT of the cervical spine was obtained, which indicated "straightening of the C-spine indicating spasms." Employee was given pain medication and a muscle relaxer and told to follow up with his physician when he returned to his home state of Florida.

Upon his return to Florida, Employee went to an emergency room in Gainesville on March 18 and reported an injury to his right shoulder, right upper back, and neck when his truck malfunctioned and began "'jerking in an upward and downward motion' for approximately 45 minutes." CT scans of the cervical and thoracic spine were obtained, and the cervical scan was compared with a prior CT scan of Employee's neck dated July 29, 2022. The radiology report stated, "No acute fracture or traumatic subluxation in the cervical or thoracic spine. . . . Findings that are non-emergent, not unexpected, relatively minor, already known, not significantly changed or are unlikely to result in short term morbidity." X-rays of Employee's right shoulder were also completed and compared to prior studies dated June 29, 2022, and the radiologist also noted there was no significant change in those studies. Employee was given a Toradol injection and discharged.

Employee then sought authorized treatment at another urgent care facility, 1st Choice Urgent Care, on March 28, 2023. At that time, he complained of neck and right shoulder pain from his "truck . . . violently jump[ing] up and down." He described his pain as constant, and, although it radiated from his neck to his right shoulder, he denied any

2

numbness or tingling in his hands. Employee returned to the clinic in April and was prescribed physical therapy, which Employer authorized. At his initial physical therapy appointment on May 12, 2023, Employee described his injury as occurring "when his truck and the trailer started bouncing due to a faulty transmission, where he had to, for an hour, try to park the truck. [Employee] state[d] that the entire time he was getting hit in the head with his personal canned goods etc[.] in storage compartments, and also had his right arm behind the passenger seat trying to safely look behind him." He denied any pain or symptoms initially but reported that the following morning "he couldn't lift his head and walk to the bathroom well enough, even had to pee into a bottle lying down." Employee returned to 1st Choice Urgent Care in June and complained that physical therapy made his pain worse. Despite this, he remained in physical therapy for ninety days. Due to a lack of improvement, the physician's assistant at the urgent care facility referred Employee to a neurosurgeon, Dr. John Stevenson.

Employee was initially seen by Dr. Stevenson on December 13, 2023, for complaints of numbness, tingling, and burning in his neck, shoulder, and arm. He reported taking ibuprofen as needed and using cannabis for pain. Employee described the injury as occurring when he "was parking his tractor trailer when there [was] a malfunction with the equipment [and] a lot of jerking in the cab which led to the onset of his neck[,] shoulder[,] and arm pain." Dr. Stevenson ordered a cervical epidural steroid injection, which was performed in March 2024. At his appointment with Dr. Stevenson in April, Employee reported he had experienced a 50% improvement in his pain for several days following the injection but that he had returned to baseline. Dr. Stevenson ordered a cervical MRI, which was completed in May 2024 and revealed "advanced intervertebral degenerative disc and joint disease [C3-C7] with severe neuroforaminal stenosis." Dr. Stevenson reviewed the MRI on July 24, 2024, and opined that the pre-existing degenerative disease was aggravated by the injury, stating "more than 51% of his complaint is related to the [workers' compensation] injury." He recommended a discectomy and fusion and stated the need for surgery was "directly related" to the reported injury. When the surgery was not authorized, Employee returned to Dr. Stevenson, who stated in his November 2024 note that "[ninety] percent" of the reason for the surgery was the workers' compensation injury and "[ten] percent" was Employee's pre-existing condition. He went on to say that "further delay in getting this gentleman treatment could lead to a chronic pain situation which could possibly become irreversible."

Meanwhile, Employer began to question the claim in light of data it had retrieved from the truck's on-board tracking systems, and it obtained a medical records review from orthopedist Dr. David West, a Tennessee-licensed physician. Dr. West completed a Final Medical Report (Form C-30A) placing Employee at maximum medical improvement on May 15, 2023, and assigning a 1% permanent partial impairment. In response to this report, Employer ceased paying temporary disability benefits and declined to authorize further medical treatment in February 2024. Thereafter, Employee filed a petition for benefit determination on May 9, 2024, seeking authorization of additional medical care and

reinstatement of temporary disability benefits.  In his affidavit in support of his request for expedited hearing, Employee stated "[w]hile backing up the truck, the truck began to shake, jerk, and jump violently, causing items to fall down on" him.  Employer then retained Dr. West to perform a medical exam in January 2025.  In preparation for this examination, Employer's counsel sent Dr. West a letter stating Employee's truck had "an accident tracking system" that was not triggered by any bouncing or violent shaking on March 9.  Employer specifically asked Dr. West to take that information "into consideration when rendering [his] causation opinion."  Following his examination, Dr. West concluded Employee suffered from degenerative conditions in his cervical spine and the alleged work incident did not contribute more than fifty percent in causing the need for surgery.

*Lay Testimony*

At the May 6, 2025 expedited hearing, Employee testified that, on March 8, 2023, at about "twenty-two hundred hours," his truck malfunctioned while he was parking it for the night at a truck stop.  Although all documentation from Employer indicated an injury date of March 9, 2023, Employee asserted the event occurred in the late evening hours of March 8.  According to Employee, he could not get the truck to shift into reverse and, when "it did move, it's banging on the ground" and the "shaking or the banging was so violent that everything that was up in [his] cupboards came down on" him.  He further testified the violent shaking continued while he tried to park for a period of ninety minutes.  According to Employee, there were fifteen to twenty witnesses to the incident because the "commotion of the tractor slamming up and down" created so much noise.  He specifically identified Jeff Havens, the truck driver parked beside him, who assisted him in parking the truck.  Mr. Havens signed a Rule 72 declaration for submission at the hearing.

During his direct examination, Employee initially admitted he had suffered a prior injury to his head and neck when he slammed into a door jamb and was knocked unconscious.  He was treated at a local hospital, and a CT scan of his cervical spine was completed.  However, later in his testimony, Employee denied injuring his neck in that incident and maintained he was evaluated and treated for a head injury only.

With respect to his treatment with Dr. Stevenson, Employee testified he had a good relationship with Dr. Stevenson and trusted his recommendations.  He expressed concern that the delay in getting approval for the neck surgery was making his condition worse.  In regard to Dr. West, Employee claimed that Dr. West told him during his medical examination that he (Dr. West) had not reviewed the medical records.  He also asserted that Dr. West did not physically examine him, and that Dr. West was with him for "[n]o more than 15 minutes."

During his testimony, Employee reiterated several times that the event occurred on March 8 and that it took ninety minutes to park the truck, stating it felt "like he was on

square tires." He did not recall parking elsewhere at the truck stop before parking next to Mr. Havens's truck, nor did he recall turning off his truck prior to parking it.

On cross-examination, Employee testified he believed Mr. Havens had erred in his written declaration stating the incident had occurred on March 9 because it was "twenty-two hundred hours" on March 8 before they were done parking the truck and suggested Mr. Havens likely looked at the date wrong when he got back into his truck. He later stated, "the accident happened" between "twenty-two hundred hours and zero dark thirty." Nevertheless, he insisted the event occurred on March 8, he made another delivery on March 9, and then went to the emergency room on March 11. When presented with documentation from Mr. Havens's company regarding the dates Mr. Havens was parked at the Love's truck stop, Employee finally agreed that the accident must have occurred on the evening of March 9, not March 8.

Also on cross-examination, Employee denied using cannabis for his pain despite the notation in Dr. Stevenson's medical records but said he did use a CBD-infused oil for his pain. Finally, Employee admitted to a prior felony conviction for possession of an illegal substance, marijuana in that instance, with intent to sell, and he had been convicted of unlawful possession of a firearm by a felon in 2020.

Mr. Havens's Rule 72 Declaration stated that Employee was attempting to park next to him that evening and Employee's "truck shook and jerked forcibly and vigorously" every time he put it in reverse. Mr. Havens further stated he assisted Employee with parking the truck and the process took "approximately an hour to an hour and a half." Finally, Mr. Havens stated that he did not know Employee or have any relationship with Employee prior to March 9, 2023.[1]

For its part, Employer presented testimony from Geoffrey Beck, senior counsel in risk management, and Carmen Penney, the company's risk management manager. Mr. Beck testified at length regarding the company's use of the "Lytx" system, which is an after-market camera system placed in all company-owned vehicles. According to Mr. Beck, when a triggering "event" occurs, the accelerometer inside the camera, which is positioned in the cab, detects the unusual movement and causes the camera to capture twelve seconds of video, eight seconds before the triggering event and four seconds afterward. Mr. Beck testified the events the system records include but are not limited to a hard brake, a lane change, a rough or uneven surface, following too closely, rapid acceleration, and motor vehicle accidents. Mr. Beck explained it was his responsibility to

---

[1] Employer deposed Mr. Havens on April 15, 2025, at which time he reiterated he did not know Employee prior to March 9, 2023. He testified the incident occurred at the Love's truck stop in Dickson, Tennessee, and that once he assisted Employee, the two exchanged phone numbers. He witnessed the truck shaking, as well as items falling out of cabinets and hitting Employee on the head. He testified he did not hear from Employee following the event until November or December of 2024, when Employee contacted him and asked him to complete an affidavit regarding what happened at the truck stop.

review the incident reports and video clips daily. At the time of the hearing, there were no videos available from Employee's truck dated March 9, 2023, because the recordings are only retained for 90 days unless an incident is reported that prompts Employer to preserve them. Because Employer initially accepted the claim, Mr. Beck did not see a reason that any videos would have been preserved. However, he further explained that even if video clips of the alleged incidents are unavailable, reports of those incidents would still have been generated and would be available for review.

In the present case, Mr. Beck provided a report from the Lytx system on the truck driven by Employee from March 8 to March 10, which showed only two triggering "events" during that period, both on March 9. The first occurred at 3:54 p.m. and was for speeding, and the second occurred at 4:24 p.m. and was for following too close. There were no reports of any additional triggering events that occurred on March 8, 9, or 10. Mr. Beck testified that, based on his routine and longstanding use of the Lytx system, it would have captured video of the type of event described by Employee and Mr. Havens. As examples, he provided numerous recordings from the Lytx systems of other trucks that were backing up and being jarred roughly, and those events were recorded as a possible collision or as a rough, uneven surface. He testified the events recorded in those instances were less severe than what Employee described, and, based on his years of experience with Lytx, he believed the program would have generated an "event" report if Employee's truck had been shaking and bucking as he had reported. Mr. Beck also stated that, because the system was functioning properly earlier in the day, there was no reason to believe it was not functional at the time of the reported incident and there was no evidence the Lytx system malfunctioned after the alleged event.

On cross-examination, Mr. Beck testified that the Lytx system would send an alert if the camera was not working properly. He checked the specific truck Employee was driving on the day of the event and did not find any such report. He acknowledged that it was theoretically possible for a driver to tamper with or disconnect the Lytx system, but he stated Employer would have received an alert if the camera had been disconnected or stopped operating. He went on to say that if the system had become disconnected in the incident Employee described, "as soon as it regained power, it would have uploaded additional events that would have been available . . . in the portal." In his words, "as long as the truck is connected to power, then those events should be uploading in the system." Based on his experience with the system, Mr. Beck testified that he believed there would have been multiple events recorded by Lytx over the ninety-minute timeframe described by Employee and Mr. Havens, although Mr. Beck admitted he was not an expert in the technical aspects of Lytx technology. Employee's counsel asked repeatedly about Employer's practice of retaining videos from Lytx for ninety days, and Mr. Beck repeatedly responded that if there had been a triggering event sufficient to create a video, he would still have the report of the incident, even if the video had been purged. Finally, Mr. Beck was asked if there had been any work orders on the truck since March 9, 2023, and he testified he had learned during the hearing there were work orders, but he was not certain

what they were for. He presumed some form of maintenance had been done on that truck in the two years since the reported work injury.

Following Mr. Beck's testimony, Ms. Penney testified regarding Employer's internal process of handling workers' compensation claims and the information obtained from the trucks' GPS system. Ms. Penney stated that when she read Employee's deposition testimony and learned he was alleging that his injury was caused by the truck malfunctioning for an hour and a half, she reviewed the GPS history for the truck. Ms. Penney explained that Employer installed GPS tracking devices on all company-owned trucks, and the GPS location of all its trucks are "pinged" every five minutes. That information is then communicated to the engine control module. The GPS also "pings" if the truck engine is turned on or off, and it also pings the truck location once an hour. This information can be compiled into a report detailing the precise latitude and longitude of the vehicle, the distance between the truck and the nearest city, and whether the truck was on or off at a certain time. Ms. Penney testified there is some distance variance accounted for in the GPS coordinates, and that the variance can be up to 80 feet from the longitude coordinate and 101 feet from the latitude coordinate.

Ms. Penney testified that, based on her review of the GPS reports from Employee's truck on March 9, it arrived at the Love's truck stop at 7:20 p.m.[2] At 7:21 p.m., the system sent another "ping," this time because the truck's engine had gone from "on" to "off." At 7:26 p.m., another "ping" indicated the truck remained off and was in the same location. At 7:28 p.m., the system "pinged" that the truck's engine had started again, but it remained in the same location until 7:39 p.m. At that time, the GPS information indicated the truck had begun to move closer to the parking area at the truck stop, where it remained at the next "ping" at 7:44 p.m. Finally, the engine of the truck turned off at 7:47 p.m. and remained off throughout the night until 6:41 a.m. the next morning. Ms. Penney testified the GPS data indicated that Employee's truck was at the Love's truck stop for a total of twenty-seven minutes before the engine was turned off for the night, and Employee spent a total of eight minutes parking the truck between 7:39 p.m. and 7:47 p.m.

On cross-examination, Ms. Penney testified that, based on her review of the Lytx system, the truck's GPS system accurately recorded the truck's coordinates for the two incidents Mr. Beck identified earlier as occurring on March 9, so she had no reason to believe that the GPS system had malfunctioned at the time of the reported incident. She further testified that every time a work-related injury is reported to someone in her department, they review the Lytx system to see if an event was recorded at the time of the reported injury. She testified the "pings" would not have been triggered by the shaking of the truck, but instead are triggered based on time, change in location, or the engine being turned on or off. She further testified that the initial report from Employee included his statement that the warning light for the clutch came on at the time of the shaking incident.

---

[2] All times referenced are central standard time.

As a result, an examiner in her department had reviewed the work orders for that date, and there were no work orders for the clutch on the truck involved in the alleged incident. Furthermore, she testified the only sensor that was triggered in the truck on March 9 was the anti-lock braking system sensor at 11:35 a.m., well before Employee arrived at the truck stop later that evening.

*Expert Medical Testimony*

The parties deposed both Dr. Stevenson and Dr. West in preparation for the expedited hearing. Dr. Stevenson testified he is a board-certified neurosurgeon in Florida. He began treating Employee in December 2023, when Employee came to him complaining of neck pain due to a work incident in March 2023. He stated Employee presented with bilateral neck pain radiating into his right arm and right hand with associated numbness. Dr. Stevenson diagnosed Employee with cervical radiculopathy secondary to cervical spondylosis aggravated by his work injury. Because Employee had attempted physical therapy for an extended period of time without improvement, Dr. Stevenson recommended a steroid injection, and when that was unsuccessful, recommended surgery due to Employee's persistent radicular pain. He testified that Employee's need for the surgery was "directly related to his work injury . . . based on his history and the story [he was] aware of." In regard to what history had been related to him, Dr. Stevenson agreed that Employee had described a "work injury where the truck was bouncing up and down." He reviewed a 2022 CT scan of Employee's neck and agreed with the radiologist's determination that Employee's anatomic condition was unchanged in his March 18, 2023 CT scan. As such, Dr. Stevenson stated his causation opinion was based on the fact that Employee reported he was asymptomatic before the March 9, 2023 incident and was symptomatic after the alleged work accident. Finally, Dr. Stephenson agreed that if the history given by Employee was "inaccurate or . . . incomplete or . . . untruthful," then his opinion as to causation would change.

Dr. West is a board-certified orthopedic surgeon practicing in Tennessee. He testified he performed both a records review and an in-person evaluation of Employee at Employer's request. He testified that Employee had a "whiplash-type injury" when his cab "shook violently." He opined Employee had a "chronic whiplash injury or a cervical sprain/strain." Dr. West noted the lack of video data to support the occurrence and admitted counsel for Employer had sent him a letter advising of Employer's doubts regarding whether the incident occurred as described by Employee. Dr. West went on to state, "I also have some knowledge of these 18-wheelers from doing this over many years that these trucks – these 18-wheelers . . . have a very sophisticated system of monitoring . . . ." Dr. West stated that when he initially reviewed the records, he felt that the most likely diagnosis was a cervical sprain or strain. Later, when surgery was recommended and he personally evaluated Employee, he concluded that the "surgery was not related to alleged bucking of the cab." He further commented that it was "highly improbable" such an event as described

8

by Employee would cause the need for a four-level cervical fusion surgery. Dr. West testified he disagreed with Dr. Stevenson for several reasons:

> The mechanism . . . doesn't add up, number one. Number two, there is no documented evidence there was bucking. There [are] three or four exams prior to Dr. Stevenson, nine months prior, or eight months prior that do not demonstrate radiculopathy. And the fact that he's asking for surgery for four levels is even more highly unlikely that it's related. I'm not trying to say the patient doesn't need surgery. . . . But it's not related to the incident of shaking, if it did happen.

Dr. West did admit, on cross-examination, that it was possible a "whiplash-type injury" could exacerbate or aggravate a pre-existing condition, but stated it was not "likely" in Employee's case.

In its May 16, 2025 order granting benefits, the court addressed Employer's challenges to Employee's credibility. First, it noted that Employee testified that he was attempting to park his truck for forty-five minutes while it was shaking violently; however, that is not an accurate summary of the testimony in the transcript. Instead, Employee testified several times that the event lasted approximately ninety minutes.[3] The trial court went on to state that the inconsistencies in Employee's testimony regarding the date his injury occurred did not affect his credibility. The court also found that Employee's testimony regarding his use of "CBD oil" to treat his pain, as opposed to the reference in Dr. Stevenson's report to Employee's cannabis use, had no impact on his credibility. It further determined that Employee's initial report of a low back injury versus his later report of a neck injury did not make his testimony less credible.[4] Finally, with respect to the objective evidence submitted by Employer from its on-board Lytx and GPS systems, it stated, "Mr. Beck and Ms. Penn[e]y believed the accuracy of their interpretations of the technical data they reviewed. However, they are users of the system, not experts. [Employer] presented no evidence that a malfunction like [Employee] reported would not interfere with the functioning of the GPS or Lytx systems." Based on this assessment, the trial court found that Employee's testimony was credible and that he was likely to prevail at trial in proving he suffered a cervical spine injury arising primarily out of the shaking incident that allegedly occurred on March 9, 2023.

The court then considered the primary cause of Employee's need for neck surgery, weighing both experts' opinions. In doing so, it noted that Dr. Stevenson saw Employee repeatedly, whereas Dr. West only saw Employee once. Although the court noted it was

_____

[3] The only reference in the record to the alleged event taking forty-five minutes is contained in a medical report from a Gainesville emergency room and is inconsistent with Employee's later testimony.

[4] The trial court did not address whether Employee's prior convictions for possession with intent to sell or ownership of a firearm with a felony conviction impacted its credibility determination to any extent.

unclear what medical records Dr. Stevenson actually reviewed in his assessment of Employee's case, it then stated that "Dr. West had those records available and claimed to have read them." Furthermore, the court noted Dr. West's statement that Employee did not complain of numbness and tingling in his arm until nine months after the incident, even though the medical records showed Employee consistently complained of such symptoms beginning three months after the incident. Finally, the court found that Dr. West's opinion was influenced by the unsubstantiated statements of Employer's counsel asserting that no bouncing or shaking event occurred as reported by Employee, and it determined that Dr. Stevenson's opinion offered "the most probable explanation of the causation of [Employee's] need for surgery." The court ordered Employer to authorize the surgery and pay additional temporary disability benefits from February 16, 2024 through August 30, 2024. Finally, Employee requested attorneys' fees for the wrongful denial of medical treatment, and the court deferred its decision on that request until the conclusion of the case. Employer has appealed.

**Standard of Review**

The standard we apply in reviewing a trial court's decision presumes that the court's factual findings are correct unless the preponderance of the evidence is otherwise. *See* Tenn. Code Ann. § 50-6-239(c)(7) (2024). When the trial judge has had the opportunity to observe a witness's demeanor and hear in-court testimony, we give considerable deference to factual findings made by the trial court. *Madden v. Holland Grp. of Tenn., Inc.*, 277 S.W.3d 896, 898 (Tenn. 2009). The deference to such findings can be overcome by clear and convincing evidence to the contrary. *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999). Furthermore, "[n]o similar deference need be afforded the trial court's findings based upon documentary evidence." *Goodman v. Schwarz Paper Co.*, No. W2016-02594-SC-R3-WC, 2018 Tenn. LEXIS 8, at *6 (Tenn. Workers' Comp. Panel Jan. 18, 2018). Similarly, the interpretation and application of statutes are questions of law that are reviewed *de novo* with no presumption of correctness afforded the trial court's conclusions. *See Mansell v. Bridgestone Firestone N. Am. Tire, LLC*, 417 S.W.3d 393, 399 (Tenn. 2013). We are also mindful of our obligation to construe the workers' compensation statutes "fairly, impartially, and in accordance with basic principles of statutory construction" and in a way that does not favor either the employee or the employer. Tenn. Code Ann. § 50-6-116 (2024).

**Analysis**

On appeal, Employer had identified four issues, the first three of which we combine and restate as whether the trial court erred in determining Employee's testimony regarding the circumstances of the alleged accident was credible. Employer's fourth issue is whether the court exhibited unfair bias toward Employee. During oral argument, counsel for Employer stated that the case centered on the fact that Employer denies the occurrence of the shaking event described by Employee. For his part, Employee contends the court was

correct in finding him credible and awarding benefits but argues the trial court erred in not awarding attorneys' fees at this interlocutory stage in the litigation.

It is well established that an appeals court must give deference to a trial court's determinations relative to the credibility of witnesses. *Kelly v. Kelly*, 445 S.W.3d 685 (Tenn. 2014). In *Kelly*, the Tennessee Supreme Court addressed the role of appellate courts in reviewing a trial court's factual findings, stating:

> When it comes to live, in-court witnesses, appellate courts should afford trial courts considerable deference when reviewing issues that hinge on the witnesses' credibility because trial courts are uniquely positioned to observe the demeanor and conduct of witnesses. Appellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary. In order for evidence to be clear and convincing, it must eliminate any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. Whether the evidence is clear and convincing is a question of law that appellate courts review de novo without a presumption of correctness.

*Id.* at 692-93 (internal quotation marks and citations omitted).

In its order, the court specifically found Employee and Mr. Havens to be credible and accepted their accounts of the incident. The court also found that Employer's witnesses merely provided "circumstantial proof" that the incident did not occur as Employee described. The court's order also reflects that it accepted Employee's testimony that he was attempting to park for forty-five minutes, although this finding is contrary to Employee's testimony. As Employer points out, Employee consistently testified that it took him ninety minutes to park, and he supported that testimony with Mr. Havens's Rule 72 Declaration.

The trial court acknowledged Ms. Penney's testimony regarding the truck's GPS coordinates on the day of the alleged incident, which indicated: (1) the truck was only at the truck stop for twenty-seven minutes before being turned off for the night; and (2) the parking of the truck took approximately eight minutes. However, the court concluded that "[p]arking a truck shaking as violently as both men described likely skewed their impression of the time involved." Yet, no witness testified that their perception of time felt skewed, and, even when the timing of the event was vigorously challenged during cross examination, Employee consistently and repeatedly testified that the incident lasted ninety minutes.

Furthermore, the court chose not to give weight to any of the objective data provided by Employer's witnesses, stating that although the witnesses "believed the accuracy of their interpretation of the technical data they reviewed," they are "users of the systems, not

experts." However, Employer never offered either witness as an expert, and their testimony was not intended to be expert testimony. Instead, they were offered as custodians of the records of the Lytx and GPS systems on the truck Employee alleges malfunctioned on the date in question. They identified and authenticated the information contained in those records and what type of information is typically contained in the records, as well as how they utilize those records on a regular basis. Mr. Beck testified repeatedly that, based on his experience with the Lytx system, that system would have been activated and would have produced a report if the truck had been shaking as violently as Employee testified. Ms. Penney provided a complete timeline of the truck's location and movements at the truck stop as well as when the engine was on and off. The court noted that the coordinates provided by the GPS system on the truck contemplate that there could be some distance variance, which it concluded could allow for other interpretations of how long it took to park the truck. However, the trial court did not address the fact that the truck was only at the truck stop for a total of twenty-seven minutes before being turned off for the night at 7:47 p.m., well before "twenty-two hundred hours," as Employee testified. Simply put, if the objective GPS data is accurate, Employee's account of the alleged shaking event could not be true.

It is Employee's contention that the Lytx and GPS systems on his truck must have malfunctioned because the truck's transmission malfunctioned. Yet, he offered no evidence supporting this assertion other than his lay opinion that such a malfunction was the only possible explanation. The court's order suggests it accepted that argument when it stated that Employer "presented no evidence that a malfunction like [Employee] reported would not interfere with the functioning of the GPS or Lytx systems." We conclude, however, that the court's analysis on this issue improperly shifted the burden to Employer to affirmatively prove a negative; namely, that the Lytx and GPS systems did *not* malfunction and that the event could *not* have occured as Employee described.

It is well settled that the employee in a workers' compensation case bears the burden of proving all essential elements of his claim, even at an interlocutory stage of the case. *See Scott v. Integrity Staffing Solutions*, No. 2015-05-0055, 2015 TN Wrk. Comp. App. Bd. LEXIS 24, at *6 (Tenn. Workers' Comp. App. Bd. Aug. 18, 2015). Although an employee need only prove a likelihood of prevailing at trial to secure benefits at an interlocutory hearing, "this lesser evidentiary standard . . . does not relieve an employee of the burden of producing evidence of an injury by accident that arose primarily out of and in the course and scope of employment at an expedited hearing." *Buchanan v. Carlex Glass Co.*, 2015-01-0012, 2015 TN Wrk. Comp. App. Bd. LEXIS 39, at *6 (Tenn. Workers' Comp. App. Bd. Sept. 29, 2015). Here, it was Employee's burden to prove by a preponderance of the evidence that he is likely to prevail at trial in showing his truck malfunctioned while he was parking it and that the shaking of the truck is the primary cause of his need for a cervical fusion surgery. In its defense of Employee's claim, Employer presented admissible evidence supporting its argument that the injury could not have occurred the way Employee described. Although Employee has *claimed* the truck

12

malfunctioned and, in turn, that must have caused the Lytx and GPS systems to malfunction, he has, to date, presented no evidence to support that theory or rebut Employer's proof. When combined with the various inconsistencies in Employee's testimony as detailed above, we conclude Employee has not met his burden of proof at this interlocutory stage of the case.

From the outset of the claim, Employee's description of what occurred has evolved. In his initial report, he stated that the sensor for the clutch came on during the shaking, causing low back pain. However, his initial medical visit and every appointment thereafter recorded complaints of neck pain. At his March 18, 2023 medical appointment, Employee reported that the shaking occurred for forty-five minutes, then later suggested to another medical provider that the event lasted an hour. However, in his later statements and testimony, he repeatedly insisted that the event lasted ninety minutes. Further, it was not until his physical therapy appointment in May 2023 that he first reported the shaking was so violent that items from cabinets above him fell and struck him on the head. Finally, his testimony that the shaking incident lasted for ninety minutes and continued until after 10:00 p.m. was directly contradicted by objective GPS data indicating the truck arrived at the truck stop at 7:20 p.m., was moved to the parking area at approximately 7:39 p.m., and the truck's engine was shut off for the night at 7:47 p.m.

Employee also provided conflicting testimony as to why he underwent a 2022 CT scan of his neck. During his direct testimony, he initially admitted that he had a prior neck injury due to hitting his head on a door jamb, but then later denied that this event resulted in a neck injury and insisted it was a minor head injury. He denied using cannabis to treat his pain as reflected in Dr. Stevenson's records, but he has admitted having a prior conviction of possession of marijuana with intent to sell. He insisted during his testimony that Dr. West did not read his medical records or perform a physical examination at the time of his evaluation, yet it is undisputed that Dr. West had previously completed a medical records review and described his physical examination of Employee in his January 7, 2025 report. In short, the trial court ordered benefits, including presumably a cervical spine surgery, based largely on its assessment of Employee's credibility. Considering the proof available to the trial court, we conclude there is clear and convincing evidence that the court's assessment of Employee's credibility was erroneous at this stage of the case.

*Bias of the Court*

Finally, Employer contends in its brief that the trial court was unfairly biased in favor of Employee based on its alleged misstatements describing some of Employee's testimony, as well as its determination that Employer submitted no evidence that the truck's malfunctioning as Employee described would trigger the Lytx system. It further asserts the court impermissibly shifted the burden of proof to Employer. We conclude, however,

13

that Employer has not shown these portions of the trial court's order exhibited a bias in favor of or against either party. As such, we find this argument to be without merit.[5]

## Conclusion

In conclusion, for the reasons outlined above, we reverse the trial court's order and remand the case. Costs on appeal are taxed to Employee.

---

[5] All other issues raised by Employer are pretermitted by our determination regarding the trial court's finding of credibility, as is the issue of attorneys' fees raised by Employee.

14



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
# WORKERS' COMPENSATION APPEALS BOARD

| | | |
|---|---|---|
| David Rainey | ) | Docket No. 2024-10-3184 |
| | ) | |
| v. | ) | State File No. 19611-2023 |
| | ) | |
| U.S. Xpress, Inc., et al. | ) | |
| | ) | |
| | ) | |
| Appeal from the Court of Workers' | ) | Heard August 1, 2025, |
| Compensation Claims | ) | in Nashville, TN |
| Thomas L. Wyatt, Judge | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Appeals Board's decision in the referenced case was sent to the following recipients by the following methods of service on this the 28th day of August, 2025.

| Name | Certified Mail | First Class Mail | Via Fax | Via Email | Sent to: |
|---|---|---|---|---|---|
| C. Scott Johnson | | | | X | csj@smrw.com kem@smrw.com |
| Ashley B. McGee | | | | X | ashleymcgee@rockylawfirm.com paige@rockylawfirm.com |
| Thomas L. Wyatt, Judge | | | | X | Via Electronic Mail |
| Kenneth M. Switzer, Chief Judge | | | | X | Via Electronic Mail |
| Penny Shrum, Clerk, Court of Workers' Compensation Claims | | | | X | penny.patterson-shrum@tn.gov |

_Q. Yearwood_

Olivia Yearwood
Clerk, Workers' Compensation Appeals Board
220 French Landing Dr., Ste. 1-B
Nashville, TN 37243
Telephone: 615-253-1606
Electronic Mail: WCAppeals.Clerk@tn.gov